**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **MARGARET RODRIGUEZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:06-CV-151-BH** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Consent Case** |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the District Court's *Order of Reassignment*, dated February 2, 2007, this case been transferred to the undersigned United States Magistrate Judge for the conduct of all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c).  Before the Court are *Brief for Plaintiff* ("Mot."), filed May 15, 2007, and *Defendant's Brief* ("Resp."), filed July 18, 2007.  Plaintiff did not file a reply.  Having reviewed the evidence of the parties in connection with the pleadings, the undersigned is of the opinion that the final decision of the Commissioner should be **AFFIRMED**.

## I.  BACKGROUND[1]

### A.  Procedural History

Margaret Rodriguez ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for supplemental security income and disability benefits.  Plaintiff filed a claim for supplemental security income (SSI) and

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

disability insurance benefits (DIB) on October 14, 2003. (Tr. at 11). Her SSI claim under Title XVI of the Social Security Act has a protective filing date of August 1, 2003. (Tr. at 11, 177). Her DIB claim under Title II of the Social Security Act has a protective filing date of September 2, 2003. (Tr. at 11, 51). Plaintiff claimed she was disabled due to: (1) memory loss; (2) severe neck and head pain and numbness on the right side; (3) fibromyalgia; (4) an improperly functioning right leg; (5) dizzy spells; and (6) a previous attack by a dog. (Tr. at 62). Plaintiff's application was denied initially and upon reconsideration. (Tr. at 23-24, 187-88). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 32). A hearing, at which Plaintiff personally appeared and testified, was held on June 7, 2005. (Tr. at 195-220). On May 22, 2006, the ALJ issued her decision finding Plaintiff not disabled. (Tr. at 8-20). The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision. (Tr. at 4-6). Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 4). Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on September 14, 2006.

**B.** **Factual History**

**1.** **Age, Education, and Work Experience**

Plaintiff was born on September 30, 1952. (Tr. at 51). She completed the eighth grade. (Tr. at 67). She previously worked as a day worker cleaning apartments and as a home health care aide. (Tr. at 63).

**2.** **Medical Evidence**

On January 27, 2003, Plaintiff visited the Huguley Medical Center in Fort Worth because she was bitten by a dog. (Tr. at 81-89). An x-ray read by Dr. Steven Fields, M.D., showed a normal

pelvis and normal right wrist with no significant osseous or soft tissue abnormalities. (Tr. at 81). She was diagnosed with open wounds and received stitches, a splint, and diptheria and tetanus toxoid shots. (Tr. at 84-85).

On February 18, 2003, Kim Hansen, R.N., C.F.N.P., (certified family nurse practitioner) examined Plaintiff at the Wichita Falls Community Healthcare Center. (Tr. at 124). Plaintiff complained of thoracic, hip, and flank pain; she also complained that she sometimes could not lift things with her right hand. On examination, Nurse Hansen noted that Plaintiff was 5'4" tall, weighed 198 pounds, and had a blood pressure of 152/120. Nurse Hansen noted decreased grip strength in Plaintiff's right arm and hand. Nurse Hansen also observed a weakness in Plaintiff's ankle or foot, but did not specify which. (Tr. at 123). Nurse Hansen diagnosed Plaintiff with hypertension, diabetes mellitus, irritable bowel syndrome, and arthritis. (Tr. at 124). She prescribed three medications, ordered laboratory tests, and referred Plaintiff for an x-ray. Laboratory results from March 6, 2003, showed elevated rates for four blood chemistry measurements. (Tr. at 120-21).

On March 28, 2003, Plaintiff returned to the Wichita Falls Community Healthcare Center. (Tr. at 119). Nurse Hansen characterized Plaintiff as "obese" due to her weight of 199.75 pounds. On examination, Nurse Hansen observed hyperreflexia (dampened reflexes) in the right patellar and brachioradialis deep tendon reflexes. Nurse Hansen diagnosed Plaintiff with hypertension, diabetes mellitus, arthritis, muscle spasms, and radicular pain. Nurse Hansen prescribed medications for diabetes (Glucophage), hypertension (Lotensin), and arthritis (Bextra and Flexeril). Nurse Hansen instructed Plaintiff about her diet, exercise and fat and cholesterol intake. She also referred Plaintiff to a neurologist.

On April 17, 2003, Dr. R. Braden Neiman, M.D., a neurologist, evaluated Plaintiff on a chief

complaint of numbness and weakness. (Tr. at 173-75). Dr. Neiman noted that Plaintiff's affect was appropriate with normal mood and no mood instability; he also noted that her concentration span and memory skills were intact for both visual and verbal tasks and that her judgment and insight were good. Dr. Neiman noted a motor strength of 4/5 in the right upper and lower extremities, 5/5 strength in the left, and decreased fine finger strength movements. Her coordination was normal, her station and gait were intact, and her reflexes were "brisk and symmetric with no pathologic responses." Dr. Neiman noted that Plaintiff's sensation was "decreased in her feet to all modalities" and that her reflexes were 2+ except absent in both Achilles. Dr. Neiman's diagnostic impressions were: (1) right-sided weakness with possible cerebrovascular disease or demyelinating disease; and (2) possible cervical and lumbar radiculopathy. Dr. Neiman ordered a brain MRI scan to evaluate her for demyelinating diseases and other neurological disorders. He also ordered a carotid and transcranial ultrasound scan. (Tr. 173-175). Dr. Terry Seegers, M.D., a radiologist, performed a brain MRI on May 2, 2003, and noted that the examination was normal. (Tr. at 167). A carotid sonogram performed by Dr. Paul Renton, M.D., showed no significant plaque or stenosis. (Tr. 163).

On July 15, 2003, Plaintiff saw Dr. Neiman again. (Tr. at 172). He noted that both the MRI and the ultrasound were unremarkable, and he found Plaintiff to be alert and oriented. He also noted that her cranial nerves were intact and that her motor strength was 5/5. Dr. Neiman diagnosed Plaintiff with "possible fibromyalgia" and referred her to Dr. Cooper for her somatic complaints since he found no medical evidence consistent with multiple sclerosis or any other cerebrovascular disease.

On July 29, 2003, Plaintiff saw Nurse Hansen again. (Tr. at 118). Nurse Hansen wrote that Plaintiff "reports numerous somatic complaints and problems, adding new ones as soon as one is

resolved." On examination, Plaintiff had a full range of motion and a grip strength of 3/5 in both arms. Nurse Hansen continued Plaintiff's current medications and referred her to physical therapy. She also noted that Plaintiff's pain was "difficult to manage" and that it "sound[ed] like fibromyalgia."

On September 4, 2003, Plaintiff returned to the Wichita Falls Community Healthcare Center. (Tr. at 117). The unidentified examiner diagnosed her with degenerative joint disease/degenerative disc disease in her cervical and thoracic spine, hypertension, and depression/anxiety. The examiner also wondered whether Plaintiff had rheumatoid arthritis and requested confirmation. Plaintiff began treatment on Zoloft for her depression, and she was referred for an MRI of her cervical and thoracic spine. She returned on October 16, 2003, and was referred to Dr. Cooper for the possible diagnosis of rheumatoid arthritis. (Tr. at 116).

Dr. Dianne M. Cooper, M.D., a rheumatologist, evaluated Plaintiff on January 16, 2004, for a chief complaint of "pain all over." (Tr. at 92-93). On examination of Plaintiff's musculoskeleton and extremities, Dr. Cooper noted: crepitus of both knees, and wrists, elbows; tenderness to range of motion of the shoulders but no crepitus or instability; no true synovitis; moderate tenderness at the bilateral trochanteric bursal regions; and right costovertebral angle tenderness or CVA tenderness. (Tr. at 93). Plaintiff's gait was brisk and normal and her cranial nerves were grossly intact. Dr. Cooper ordered a series of tests to evaluate Plaintiff's widespread complaints of arthritis, arthralgias, myalgias, and fatigue.

On February 12, 2004, Plaintiff received X-rays of her hands and feet. (Tr. at 94). Dr. William Tidmore, M.D., a radiologist, observed that the hands were normal in appearance other than some very small cystic-like changes and slight calcis and osteophyte formation. Dr. Tidmore noted

a "probable secondary epiphysis finding of ulnar styloid process" in her hands but that this would correlate for a possible prior Colles' fracture involving the distal ulna and radius.

Plaintiff saw Dr. Cooper again on March 1, 2004. (Tr. at 90-91). Dr. Cooper wrote that the laboratory tests showed the rheumatoid factor was positive at 26 but that other autoimmune serologies and hepatitis profile were negative. (Tr. at 90). Dr. Cooper observed that Plaintiff had synovitis in both hands and tenderness in some of her joints. Dr. Cooper diagnosed Plaintiff with "[s]eropositive rheumatoid arthritis with profound morning stiffness and synovitis in the small joints of the hands. X-rays read as mild changes of osteoarthritis with some mild cystic change in the first MTP. Otherwise, nothing impressive." Dr. Cooper initiated methotrexate, folic acid, prednisone (a steroid), and an intramuscular steroid injection; she further recommended a colonoscopy to check for inflammatory bowel disease due to Plaintiff's "history of irritable bowel syndrome, and... almost constant diarrheal illness."

On April 27, 2004, Plaintiff returned to the Wichita Falls Community Healthcare Center. (Tr. at 100). She weighed 208 pounds. The healthcare center practitioner listed the diagnosis of rheumatoid arthritis and noted that Plaintiff would check with Dr. Cooper concerning her medications. She returned to the center on June 19, 2004, for a physical. (Tr. at 96-97). She weighed 208 pounds and was diagnosed with diabetes mellitus, hypertension, rheumatoid arthritis/fibromyalgia, and possible abdominal pain.

On February 18, 2005, Dr. V.S. Nayak, M.D., of the Wichita Falls Community Healthcare Center provided a letter stating: "[t]he above named patient has uncontrolled rheumatoid arthritis and diabetes. She has been unable to work the past two years due to these conditions." (Tr. 162).

### 3. Hearing Testimony

A hearing was held before the ALJ on June 7, 2005. (Tr. at 195). Plaintiff appeared personally and was represented by an attorney. *Id.*

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was born on September 30, 1952. (Tr. at 198). At the time of the hearing, she lived at home with her husband and two grandchildren, ages 15 and 18. She testified that she completed the eighth grade and that although she started adult education in computer programming, she did not complete the course. (Tr. at 199).

Plaintiff last worked in January of 2003 as a home health care aide for the elderly. She held this position for approximately four years. Prior to her work as a home health care aide, she worked as a contract laborer for an apartment cleaning service . (Tr. at 200). She previously ran her own business in the same field. (Tr. at 201). She also worked at Wal-Mart for a few weeks as a checker. (Tr. at 202).

Plaintiff next testified about her daily activities. She stated that on a typical day, she got up, made herself some breakfast, and performed some light housework before needing to lie down and rest. (Tr. at 203). She stated that her hands were stiff all the time, especially in the morning, and that on a good day she could get her hands to move by lunch time. (Tr. at 207-08). She no longer did laundry. (Tr. at 203). She also did not cook anymore because she had difficulty lifting large pots of water. (Tr. at 206). She did the grocery shopping for the family every two weeks but required assistance when she went to the store. (Tr. at 203, 206). She drove every day and drove herself to the hearing. (Tr. at 204). She did not have any hobbies but watched television, listened to the radio, and read newspapers and magazines. (Tr. at 204). She stated that she did not have any

difficulty following the programs but had a hard time concentrating on some other tasks, such as balancing her checkbook. (Tr. at 213-14). Plaintiff did not have any social activities and no longer went to church because she could not sit through the service. (Tr. at 205, 212). The furthest she had been from home in the past two years was to Venus, Texas, with her daughter, to visit her other grandchildren.

Plaintiff also testified that she suffered from irritable bowel syndrome. (Tr. at 209-10). This caused her to go the bathroom frequently, sometimes as much as ten times a day. (Tr. at 211). Her Bentyl prescription eased the symptoms but made her drowsy, so she only took it at night. (Tr. at 209-10). She stated that she had difficulty paying for medical care and prescription medications, including those used to treat her rheumatoid arthritis. (Tr. at 210).

### b.    Vocational Expert's Testimony

A vocational expert ("VE") also testified at the hearing. The VE categorized Plaintiff's previous work experience as an unskilled day worker cleaning apartments with a medium level of physical exertion. (Tr. at 215). Plaintiff also worked as a semi-skilled home health care aide with a medium level of exertion.

The ALJ then asked the VE to assume a person with the same age, education, and work experience as Plaintiff. The hypothetical person could lift or carry 20 pounds occasionally and 10 pounds frequently and was limited to occasional climbing, kneeling, and fingering. (Tr. at 216). The VE testified that such a person would not be able to perform Plaintiff's past occupations as an apartment cleaner or as a home health care aide. With Plaintiff's transferrable skills, the VE testified that the hypothetical person could work as a play room attendant. (DOT #359.677-026; light physical exertion level, semi-skilled, SVP of 3; 34,000 positions in Texas and 466,000 in the

national economy). The VE also testified that the hypothetical person could perform several unskilled occupations, including coin machine operator (DOT #292.687-010; light, unskilled; 8,000 positions in Texas and 99,000 in the national economy); information clerk (DOT #237.367-018; light, unskilled; 5,000 positions in Texas and 70,000 in the national economy); and housekeeping cleaner (DOT #323.687-014, light, unskilled, SVP of 2; 35,000 positions in Texas and 408,000 in the national economy). (Tr. at 216-17).

On examination by Plaintiff's attorney, the VE testified that a person who was unable to use her hands due to morning stiffness for the first four hours of the day would not be able to perform any of the above listed occupations. (Tr. at 217). The VE also testified that someone who needed frequent unscheduled breaks to go to the restroom would not be able to perform any of the above listed jobs, either. (Tr. at 218). The VE also testified that someone who had poor concentration, poor memory, missed three days of work per month, or who needed frequent naps, would not be able to perform competitive work. (Tr. at 218-219).

## C.      **ALJ's Findings**

The ALJ issued her decision denying benefits on May 22, 2006. (Tr. at 8-20). The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 30, 2005, but not thereafter. (Tr. at 14, ¶1). She also found that Plaintiff had not engaged in any substantial gainful activity at any relevant time through the date of the decision. (*Id*. at ¶2). The ALJ determined that Plaintiff suffered from the severe impairments of diabetes mellitus, obesity, hypertension, and chronic pain/fibromyalgia. (*Id*. at ¶3). The ALJ found that none of the severe impairments or any combination of these impairments met or medically equaled a listed impairment. (*Id*. at ¶ 4). The ALJ stated that the findings for Plaintiff's complaints of pain in the hands, back,

feet, and neck were "normal, except for a small cyst a the right first metatarsal head and probable epiphysis of the distal ulnar and radius." (Tr. at 14). The ALJ also found that there were no findings of a lack of gross and fine manipulation, and that there was no consistent evidence of reflex loss, motor loss, sensory loss, muscle atrophy, positive straight-leg raising or other findings to meet the requirements for a listed musculoskeletal impairment. (Tr. at 15). The ALJ further found that the "listed impairment for rheumatoid arthritis refers to other body symptoms, such as musculoskeletal, skin, or respiratory systems." *Id*. The ALJ also noted few laboratory or other findings to support a listed finding of arthritis or other auto-immune disease. *Id*. The ALJ also found that Plaintiff's complaints of irritable bowels did not meet the requirements for a listed digestive system impairment. *Id*.

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to "lift and/or carry twenty pounds, ten pounds frequently. She can climb, kneel, and finger occasionally." (Tr. at 15, ¶5). The ALJ assessed Plaintiff's subjective allegations of pain in accordance with Social Security Ruling ("SSR") 96-7p. (Tr. at 16). Specifically, the ALJ considered Plaintiff's complaints of arthritis, weakness in her right hand, morning stiffness, irritable bowel syndrome, rheumatoid arthritis, depression, and medication-induced drowsiness. The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, duration, and limiting effects were not entirely credible. *Id*.

The ALJ found that Plaintiff could not perform her past relevant work as a health care aide or as a day worker. (Tr. at 18, ¶6). The ALJ considered Plaintiff's RFC along with her age, education, and work experience and found that she could not perform all or substantially all of the

requirements of light, unskilled work. (Tr. at 19). Plaintiff could, however, perform the requirements of a play room attendant, a coin machine collector, an information clerk, and a housekeeper or cleaner. *Id.* As a result, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act from January 23, 2003, through the date of the decision. (Tr. at 20, ¶11).

## II. ANALYSIS

### A. <u>Legal Standards</u>

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, but less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759

F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual

functional capacity must be considered to determine if work can be performed. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.** **Issue for Review**

Plaintiff raises a single issue for review: "[w]hether the Administrative Law Judge's finding as to Plaintiff's residual functional capacity is supported by substantial evidence and/or results from prejudicial legal error." (Mot. at 1).

**C.** **Residual Functional Capacity**

Social Security regulations provide for the ALJ to assess a claimant's RFC before proceeding from step three to step four of the sequential analysis that determines whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). When assessing a claimant's physical abilities, the ALJ first assesses the nature and extent of the physical limitations and then determines the RFC. 20 C.F.R. § 404.1545(b). "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-

related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." *Id*. "RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting." *Id*. at *2 (emphasis in the original). The RFC is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988).

Plaintiff contends that the ALJ's RFC assessment is not supported by substantial evidence due to a misreading of the medical evidence and a faulty credibility assessment. (Mot. at 11-13). Plaintiff also contends that the ALJ committed legal error in the RFC assessment by not applying SSR 96-8p properly and by not evaluating the functional effects of her obesity. (Mot. at 15-16).

### 1.    Medical Evidence

In the instant case, Plaintiff's complaints to her medical care providers included decreased grip strength in the right arm and hand, weakness in one ankle or foot, dampened reflexes, crepitus, synovitis, and tenderness in certain parts of the body. (Tr. at 90,118-19, 123, 172-75). Based on these complaints and other medical evidence, Plaintiff's treating physicians diagnosed her with hypertension, diabetes mellitus, irritable bowel syndrome, arthritis, depression, muscle spasms, radicular pain, possible fibromyalgia, and rheumatoid arthritis. (*See* Tr. at 90-91, 116, 119, 124, 172). To treat or alleviate the symptoms of her diagnosed impairments, Plaintiff's treating

physicians prescribed Lotensin for her hypertension; Glucophage for her diabetes; Bentyl for her irritable bowel syndrome; Bextra and Flexeril for her arthritis; Zoloft for her anxiety and depression; and methotrexate, folic acid, and two steroids for her rheumatoid arthritis. (Tr. at 90, 116, 119, 209).

Given the complaints and diagnoses listed in the preceding paragraph, Plaintiff objects to the ALJ's characterization of her medical findings as "normal." (Mot. at 11-12). The ALJ acknowledged Plaintiff's many diagnosed impairments, but observed that "[t]he claimant's treatment has been essentially routine and/or conservative. The claimant has reported many symptoms, but there are few objective findings. Most findings are normal." (Tr. at 17). In support of this statement, the ALJ referred to specific statements by Plaintiff's treating physicians. In particular, the ALJ noted the unremarkable MRI and ultrasound requested by Dr. Nieman, as well as Dr. Neiman's failure to find any abnormality consistent with multiple sclerosis or any other cerebrovascular disease and his observation that Plaintiff was alert and oriented. (Tr. at 16; *see* Tr. at 172). The ALJ also cited Dr. Cooper's determination that there was "nothing impressive" about her examination of Plaintiff, other than a diagnosis of rheumatoid arthritis with "profound morning stiffness." (Tr. at 16; *see* Tr. at 90-91). Despite the finding of morning stiffness, Dr. Cooper did not impose any restrictions on Plaintiff's physical activity.[2] (*See* Tr. at 90-91).

In addition to citing specific findings by treating physicians, the ALJ noted that Plaintiff had not received steroid injections since March 2004. The ALJ also noted the absence of further

---

[2]Plaintiff contends that the ALJ failed to acknowledge rheumatoid arthritis as a diagnosed impairment. Mot. at 12; *see* Tr. at 14, ¶3. This is a separate issue for review that was not listed in the "Issues Presented" section as required by this Court's April 25, 2007 scheduling order. Plaintiff may not raise a step 2 point of error within a brief that purports to address only a step 5 point of error. Nevertheless, the Court notes that even though the ALJ did not list rheumatoid arthritis as a severe impairment at step 2 of the sequential disability determination process, the failure to do so was harmless because the ALJ referenced rheumatoid arthritis when assessing Plaintiff's RFC. *See* Tr. at 16, 18.

treatment for her irritable bowel syndrome, depression, and memory loss, as well as the absence of medical evidence to support the alleged severity of the irritable bowel syndrome or the side effects of her medication. (Tr. at 17). The ALJ further noted that Plaintiff used over-the-counter pain medication and prescription medicines to control her symptoms. A medical impairment that can reasonably be controlled by medication, surgery, or treatment is not disabling. *Lovelace*, 813 F.2d at 59. Although Plaintiff indicated that she was not always able to afford her medication or the cost of doctor's visits, (Tr. at 210-11), Plaintiff presented no evidence that she exhausted free or low cost medical care alternatives. *See id.* ("condition that is disabling in fact continues to be disabling in law" *if* a claimant "cannot afford prescribed treatment or medicine, *and can find no way to obtain it*.") (emphasis added).

While there is no question that Plaintiff suffered from some impairments, the ALJ identified specific evidence in the medical record to support her finding that Plaintiff is not disabled within the meaning of the Social Security Act. *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (noting that the mere presence of some impairment is not disabling per se). Consequently, the Court finds that substantial evidence in the medical record supports the ALJ's determination of Plaintiff's RFC *Leggett*, 67 F.3d at 564.

## 2. Credibility

Plaintiff next argues that the ALJ erred in the RFC assessment by failing to assess her credibility properly. (Mot. at 13). Credibility determinations by an ALJ are entitled to deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). Nevertheless, the ALJ's "determination or decision [regarding credibility] must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the

individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). To shed light on an individual's credibility, Social Security regulations provide a non-exclusive list of the following seven relevant factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back...); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." (*Id*. at *3).

In the instant case, the ALJ expressly considered all available evidence, including Plaintiff's own testimony, when evaluating her credibility. (Tr. at 16-17). The ALJ noted that Plaintiff's diabetes, anxiety, depression, blood control, and pain were under control with medication. (Tr. at 17). The ALJ further noted that nothing in the treatment record supported Plaintiff's allegations of side effects from the medication. The ALJ found that Plaintiff had not "required" steroid treatment since March 2004. (Tr. at 17). While Plaintiff actually stated that she only "received" such treatment for three or four months, (Tr. at 210), her only explanation for not continuing with the steroid treatment was that she ran out of the samples Dr. Cooper provided and did not want to return for another consultation. (Tr. at 210). The ALJ also considered Plaintiff's daily activities. *Leggett*, 67 F.3d at 565, n. 12 (daily activities are appropriately considered in evaluating a claimant's disability status). Plaintiff's daily activities included preparing breakfast, light housework, grocery shopping, driving, watching television, listening to the radio, and reading newspapers and

magazines. (Tr. at 204-06). Finally, the ALJ observed that Plaintiff "did not appear especially uncomfortable during the hearing." (Tr. at 17). While exclusive reliance upon demeanor in credibility determinations is inappropriate, it is not reversible error for an ALJ to consider demeanor as one of several factors in evaluating credibility. *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990).

Plaintiff relies on *Cooper v. Bowen*, 707 F.Supp. 260 (N.D. Tex. 1989), for the proposition that merely because she engages in some activity and social interaction does not mean that she is not disabled. (Mot. at 15). In *Cooper*, a treating physician found that a homeless person retained the RFC to sit for two hours, stand for one hour, and walk for one hour. 707 F.Supp. at 264. The ALJ disregarded this finding as "absurd" because the homeless person spent his days walking the street. *Id*. The district court found that the ALJ substituted his judgment for that of the treating physician and, in doing so, denied the reality of the life of the homeless, who have no choice but to wander the streets all day. *Cooper* is easily distinguishable from the instant case because Plaintiff has not identified any evidence from a treating physician about how her RFC differs from the ALJ's determination. She merely presents the same evidence about her daily activities that was considered by the ALJ and asks the Court to arrive at a different conclusion, which is not the appropriate standard of review for this action. *Greenspan*, 38 F.3d at 236.

Plaintiff also cites to *Acosta v. Barnhart*, 2005 WL 1109436 (W.D. Tex. Apr. 25, 2005), to support her contention that the ALJ erred in the credibility assessment. In *Acosta*, the magistrate judge found prejudicial error in the ALJ's decision because the ALJ did not juxtapose specific statements found to be lacking in credibility with evidence in the record supporting this conclusion. 2005 WL 1109436, at *6. The ALJ in *Acosta* also erred because he ignored evidence in the record

and did not discuss how it supported the plaintiff's limitations. *Id.* Neither point of error applies in this case. As detailed in the preceding paragraphs, the ALJ's credibility determination contained specific reasons supported by the evidence in the case record. *See* 1996 WL 374186, at *2.

Based on the medical evidence and Plaintiff's testimony, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints about her limitations were not completely credible. *Leggett*, 67 F.3d at 564; *see* Tr. at 16.

**3.      SSR 96-8p**

Plaintiff also argues that the ALJ erred in her RFC assessment because she failed to follow SSR 96-8p. (Mot. at 15). Specifically, Plaintiff contends that the ALJ failed to conduct a function-by-function assessment of the seven strength demands outlined in SSR 96-8p and failed to find that she could perform work on a regular and continuing basis.

**a.      *Function-by-Function Analysis***

Social Security Ruling 96-8p provides that the RFC assessment is a function-by-function assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. 1996 WL 374184, at *1, 3. RFC involves both exertional and nonexertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. *Id.* at *5. The RFC assessment "considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments." 1996 WL 374184, *1. "When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." *Id.* Although

SSR 96-8p requires a function-by-function analysis, if the record reflects the ALJ applied the appropriate standard and considered all the evidence in the record, there is no error. *See Bean v. Barnhart*, 454 F. Supp.2d 616, 620 (E.D. Tex. 2006) (finding error because the court could not determine whether the ALJ considered two of the seven factors despite evidence in the record on the two factors); *see also Porter v. Barnhart*, 200 Fed. Appx. 317 (5th Cir. 2006) (unpublished) (finding compliance with SSR 96-8p when the ALJ considers the record as a whole); *Conerly v. Barnhart*, 2008 WL 724030, at *6 (S.D. Miss. Mar. 17, 2008) (same); *Winget v. Astrue*, 2007 WL 4975206, *9-10 (W.D. Tex. Dec. 14, 2007) (same).

In the instant case, the ALJ conducted her RFC determination in accordance with the appropriate regulations. (Tr. at 13) (citing 20 C.F.R. §§ 404.1545(b), 416.945(b), and SSR 96-8p). The ALJ also conducted her RFC determination in consideration of all the evidence in the record. Based on a review of the medical record, the ALJ found that Plaintiff retained the RFC to "lift and/or carry twenty pounds, ten pounds frequently. She can climb, kneel, and finger occasionally." (Tr. at 15, ¶5). Although the ALJ only explicitly assessed two of the seven strength demands (lifting and carrying) specified in SSR 96-8p, there is no evidence in the medical record that Plaintiff possessed a restricted ability to sit, stand, walk, push, or pull.

Plaintiff contends that her medical impairments restricted her ability to stand and walk. (Mot. at 15) (citing Tr. at 90-93, 123, 173-75). She fails, however, to identify specific findings in the medical record imposing limitations on her ability to walk or stand. The ALJ noted the absence of such limitations when she remarked that "[t]he claimant does not have any findings of loss of gait and station." (Tr. at 14-15; *see also* Tr. at 93 (Dr. Cooper's notation that Plaintiff's gait was "brisk and normal"); Tr. at 174 (Dr. Nieman's observation that Plaintiff's station and gait "are intact. She

can heel walk, toe walk, and tandem walk. No drift or Romberg sign is noted.")). Since the record reflects that the ALJ applied the appropriate standard and considered all the evidence, the Court finds that the ALJ did not err in her application of SSR 96-8p. *See Bean*, 454 F. Supp.2d at 620; *Elam v. Barnhart*, 386 F.Supp.2d 746, 756 (E.D. Tex. 2005) (no structural error because ALJ discussed relevant physical functions, to the extent there was evidence thereof, before he expressed RFC in terms of an exertional level); *compare McGowen v. Barnhart*, 2003 WL 24151722, *3 (N.D. Tex. Dec. 9, 2003) (remanding a case where the ALJ did not perform a function-by-function analysis of the strength demands for light work because the court could not determine whether the record contained substantial evidence to support a capacity for light work).

Even assuming, *arguendo*, that the ALJ erred in her application of SSR 96-8p, Plaintiff has not affirmatively demonstrated ensuant prejudice from the procedural error. *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981) (citing *Pacific Molasses Co. v. Fed. Trade Comm'r*, 356 F.2d 386 (1966) (reversal and remand appropriate for failure to comply with a ruling is only appropriate when claimant affirmatively demonstrates prejudice). As noted by the ALJ, two examining physicians remarked that Plaintiff's ability to walk and stand were normal. (Tr. at 14-15; *see* Tr. at 93, 174). Plaintiff cites to *Myers v. Apfel* for the proposition that had the ALJ complied with SSR 96-8p, she might have reached a different result. (Mot. at 16) (citing 238 F.3d 617, 620-21 (5th Cir. 2001)). In *Myers*, the Fifth Circuit reversed and remanded because the medical evidence as a whole indicated that the claimant could not perform all of the strength demands and because the ALJ did not resolve inconsistencies in the evidence. 238 F.3d at 621. This situation is not applicable in the instant case for the reasons stated in the preceding paragraphs. Since Plaintiff has not shown how an assessment of the five remaining strength factors (and thus adherence to the SSR 96-8p) might have resulted in a different decision regarding the RFC, Plaintiff has not established prejudice.

*Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (prejudice established by showing that adherence to ruling might have led to a different decision); *Welsh v. Barnhart*, 2002 WL 32073076, at *12 (E.D. Tex. 2002) (claimant did not show prejudice from ALJ's failure to specifically consider of all seven strength demands).

### b.        *Regular and Continuing Basis*

Plaintiff also contends that the ALJ did not include an explicit finding that she could perform work activities on a regular and continuing basis. Social Security regulations define RFC as the physical ability to perform work activity on a "regular and continuing basis." 20 C.F.R. §§ 404.1545(b), 416.945(b). Social Security Ruling 96-8p also provides that RFC "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." 1996 WL 374184, at *1. The Fifth Circuit has held that where, as here, an ALJ cites the appropriate regulations ruling, the ALJ is not required to make a specific finding that a claimant can perform work on a regular and continuing basis. *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003); *see* Tr. at 13 (citing 20 C.F.R. §§ 404.1545(b), 416.945(b), and SSR 96-8p). The ALJ therefore did not err by not making an explicit finding that Plaintiff could perform work activities on a regular and continuing basis.

### 4.        Obesity

Finally, Plaintiff contends that the ALJ committed legal error by failing to consider whether her obesity imposed additional limitations beyond those resulting from her impairments alone. (Mot. at 16).

According to Social Security Regulations, obesity itself is not a listed impairment; it can, however, reduce an individual's occupational base for work activity in combination with other ailments. *See* SSR 02-1p, 2000 WL 628049 (S.S.A. Sep. 12, 2002). The National Institutes of

Health created parameters, which are relied upon in the Social Security Regulations, for measuring three levels of obesity based on a Body Mass Index (BMI). (*Id*. at *2). Level I obesity includes BMIs of 30.0 to 34.9; Level II includes BMIs of 35.0 to 39.9; Level III, also known as "extreme" obesity, includes BMIs greater than or equal to 40.[3] *Id*. These classifications "describe the extent of the obesity, but they do not correlate with any specific functional loss." *Id*. Rather than determining a specific functional loss, obesity is a factor to be considered in the sequential evaluation process. (*Id*. at *3). At Steps 4 and 5, the Commissioner considers the effect of obesity on an individual's RFC. *Id*.

In the instant case, the ALJ found that Plaintiff's obesity was a severe impairment at step 2 of the sequential evaluation process. (Tr. at 14, ¶3). The ALJ, however, did not explicitly discuss how Plaintiff's obesity impacted her RFC. (*See* Tr. at 15-17). Plaintiff contends that this oversight is reversible error because the ALJ might have given more credit to her subjective complaints. (Mot. at 18). Plaintiff, however, failed to identify any medical evidence in the record establishing that obesity exacerbated her other medical impairments. Although Plaintiff's treating and examining physicians frequently recorded her weight, not once did they state that her obesity imposed additional limitations on her other medically diagnosed impairments. Plaintiff's point of error is therefore merely speculative since she has not met her burden to show that her obesity impacted her physical and mental ability to sustain work activity. *Leggett*, 67 F.3d at 564; SSR 02-1p, 2002 WL 628049, at *6.

### III. CONCLUSION

For the foregoing reasons, the Court the final decision of the Commissioner is **AFFIRMED**.

---

[3]At Plaintiff's most recent physical examination on June 19, 2004, she weighed 208 pounds and measured 5'4" tall. (Tr. at 96). She therefore had a BMI of 35.7. *See* NATIONAL HEART LUNG AND BLOOD INSTITUTE, *Calculate Your Body Mass Index. Available at* http://www.nhlbisupport.com/bmi/ (last visited Apr. 22, 2007).

**SO ORDERED**, on this 29th day of April, 2008.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE